Good morning, Your Honors. May it please the Court, John Kinsey appearing on behalf of the appellants, Santa Barbara Smokehouse, Inc. and DH Brands, Ltd. I also want to endeavor to reserve five minutes, please. I want to start by addressing the memorandum exception to the statute of frauds. Here, the 2019 agreement executed by both parties specifically references and acknowledges the 2017 agreement by date. This should be the end of the inquiry. Under virtually identical facts, California cases including Albion and Searles, those there, there was an unsigned agreement, and then subsequently, there was an acknowledgment of the agreement in writing. That's exactly what happened here. Well, that puts a lot of weight on a reference to a 2017 agreement that is not referred to or incorporated at all by substance. Well, it is incorporated into the agreement. In fact, the whole reason why the 2019 agreement existed is because there was an allegation of breach of the 2017 agreement. And that 2019 agreement specifically referenced the 2017 agreement by date. There is no other document, memorandum, with the terms of an agreement that has that date. The only suggestion is that there was perhaps some discussion about a five-month term. However... More than that, there was specifically, and it's in the record, a contract proposed by a five-month term. Yes. But in the context of the 2019 agreement, a five-month term makes little sense. Now, the 2017 agreement was... Well, let's stop right there. Yes. What other facts corroborate this alleged 2017 agreement? Yes. Is there ever any reference to a three-year agreement that had already been entered into? The three... I'll go ahead and lay this card on the table. One of the things I find very difficult to understand about your client's case is that this purported 2017 agreement doesn't appear anyplace else and isn't referred to anyplace else, even by your client, until much, much later. And so we have here... Let me take an example. Let's see here. There's a... So there's a document in the Supplemental Excerpt of Record 177 from Tim Brown, from your client, to Vicente de la Cruz. Vicente, whatever happened to the contract? And there's no reference to... We've already reached a three-year agreement. You gave me a contract that I signed and gave back to you. In fact, I don't find a reference to this purported 2017 agreement until after the lawsuit is filed. Are there any other references? There's lots of communications back and forth, and I never see anything from your client that says, we've already reached an agreement. You gave me a contract for a three-year term. I don't see anything like that. Can you point me to something? With respect to the term, Your Honor, there is no such writing. However, I do think the passage of time is a very important fact to demonstrate that the reference in the 2019 agreement was to the three-year term version as opposed to the five-month. Because we're talking about a 2019 agreement that was entered into two years after the July 3, 2017 agreement. So if that 2017 agreement had a five-year term, and the allegations of breach concerned events that occurred in February of 2019, that is not indicative of a five-month agreement. The only agreement that could be referenced due to that passage of time was a three-year term. No, because before that 2017 agreement, it started with a one-year contract that had long since expired by the time you get to 2017. That was a 2015 contract. It expired during the year of 2016, and yet your client and defendant continued to have dealings. They continued to sell these salmon fillets and indeed did all along without a written contract. So I hear your argument being, well, they must have entered into this July 2017 agreement because they kept selling salmon, but they'd been selling salmon for months before that purported three-year agreement in 2017. So I don't see this reference as really confirming the existence of some three-year agreement. I don't see any, and now I'm going back to the main focus of my question. If you could point me to any other reference to a signed contract or a three-year agreement entered into 2017 before this lawsuit is filed, that would help me think, well, yeah, that was really the position of your client, but I don't see that. And I appreciate that. Let me go put another card on the table. One of the things that makes me curious is I look at the purported 2017 agreement signed only by your client in your excerpt of record at 641, is that it appears to be on aqua child letterhead, only it's not quite the same as the agreement that the parties agreed was entered into in 2015. It's a different size and a different color of the aqua child symbol, and it doesn't appear in that form that I can find any place else. And, Your Honor, in the documents, Mr. Brown's declaration does include references to the fact that that document was not drafted by him. The document on the letterhead of aqua child was actually drafted by aqua child, not Smokehouse. Well, that's what he says, but actually that's really hard to understand. In the context of this is after aqua child has proposed a five-month agreement, and your client asks for a two-year agreement, and aqua child says, I'd be fired if offered two years, and you're telling me a few days later aqua child proposes a three-year agreement. That kind of screams out, wait a minute, that doesn't follow the pattern of the discussion at all. But, Your Honor, it does indicate that there is a disputed issue of fact on that issue, and we're talking about the summary judgment scandal. Two problems there. Yes. One, we've got a statute of frauds issue, which under California law appears to be a question of law. And two, if we get to a summary judgment standard, I have a hard time seeing how there's enough to get to a jury on the question of whether there was a 2017 agreement, given how inconsistent it was with the discussion, given how your client never made reference to it the many times they had an opportunity to make reference to it up to the filing of the lawsuit. Is that a conclusion a reasonable jury could reach? I do believe so, Your Honor. Then point me to some reference to an agreement for three years. Your Honor, what I can point you to, and obviously the 2017 agreement is a memorandum that very specifically references a three-year term. Are you speaking of 2019? No, Your Honor. I apologize. What I'm referring to is the 2017 agreement, and what California law provides. Well, what agreement are you talking about there, the document that's signed by your client but not by defendant? Yes, Your Honor. And that document was presented by Mr. De La Cruz after he flew from Miami to Santa Barbara to work out a deal. And that was presented to Mr. Brown, basically an offer Mr. Brown signed it. Then he took it back. He said he wanted to review it. But that being said, even if this agreement isn't taken out of the statute of frauds by virtue of there being a memorandum, Your Honor, the facts in this case are on all four corners with Searles and Albion. Both of them involved agreements with the exact amount of specificity that the 2017 document has. And in both of those cases, there was a subsequent writing that acknowledged the existence of that contract. Did either of those cases involve a subsequent writing that was years later, as opposed to something more contemporaneous to the unsigned contract? I believe, Your Honor, and you're testing my memory on Searles, that was a case where there was a very long period of time. I can provide the specific dates. But that was a case that actually involved a promissory note or a mortgage note. Right, and I think there were near in time other bank statements or other things to corroborate that this was an actual agreement. Since we're laying our cards on the table, my skepticism with your argument to add to what Judge Clifton is saying is, I have a hard time seeing how there's a back and forth between Smokehouse offering a two-year supply agreement and Aqua Chile countering with five months to only weeks later, Aqua Chile agreeing to a three-year contract that was only signed by your client. And to add to that, years later, when there are prospective buyers for Santa Barbara Smokehouse, there's an information memorandum that was sent to prospective buyers that said that there are no – that Smokehouse does not operate any long-term contracts with its suppliers. So there seems to be quite a few indications that there never was a three-year contract, and you have yet to point to anything in the record to suggest to us that it is, and quite a bit of suggestion that there wasn't. And so you're really hanging your entire hat on a reference to the 2017 unsigned agreement in the 2019 document, which I just don't know that it bears the weight that you're trying to give it. Well, Your Honor, if that document, the 2019 document, didn't refer to the 2017 agreement with the specificity of the date, that would be a completely different story. If that document was entered into the 2019 agreement and related to a breach that occurred five months after July of 2017, that would also be a completely different circumstance. But here we have a July 2017 agreement signed in July of 2017. There were allegations that that agreement was breached in early 2019, well outside of that five-month period. Well, can I push you – push back? There were allegations that there were delays in deliveries and the slowing down of business with Aqua Chile. Your client, when they complained to Aqua Chile in 2019, never referenced this supposed three-year agreement itself in their own April correspondence. How do you account for that? If there was a signed contract, a signed agreement for three years, why wouldn't they have mentioned that as opposed to complaining about it in other terms, that there's a delay, it's costing us money, that you're not agreeing to the supplies we ordered as opposed to the three-year agreement? Your Honor, I was in counsel for Smokehouse back during that time. But I think the other side of that coin is why would the parties, in a document signed by both parties, reference the 2017 agreement by date with specificity and specifically a breach relating to that agreement, had not the parties intended for the 2019 agreement to specifically reference what they believed was an ongoing transaction? Now, obviously, I think our position is that it's quite convenient for Aqua Chile to be able to say, okay, well, we only have the one document signed by Smokehouse after they've pulled the plug and it's caused Smokehouse quite a bit of damages. But at the end of the day, that reference in the 2019 agreement, well, admittedly, it doesn't specifically state the term, but we wouldn't expect that in the recitals of an agreement regarding breach necessarily. Oftentimes in our settlement agreements, we simply refer to the document that was allegedly breached. When you would expect it would be in, for example, the communication from Smokehouse Exhibit of Record 350, April 11, 2019, a couple months before the 2019 agreement was signed. This is a communication from Smokehouse to Aqua Chile complaining about the failure to provide the product and so forth. And this is where I would expect to see a reference to, we've got a three-year contract, and there's no mention of it here. Can you point me to anything that talks about a three-year agreement? Can you point me to anything other than this two-page kind of settlement memorandum prepared by Smokehouse that refers to a July 3, 2017 agreement? The document, Your Honor, that refers to this three-year term is the 2017 dated document. Which isn't signed by anybody except your client and which never appeared. And I've said this three times now. I keep waiting for a denial because I don't know the record as well as you do, but it appears that never saw the light of day. It was never given as part of the back and forth between the companies until after the relationship broke down and the lawsuit was filed. It's hard for me to escape the conclusion that that document isn't real. And I'm waiting for you to point me in the direction to show that there is something that corroborates that it is real. Well, like I said, Your Honor. I take it you don't have anything you can point me to. Isn't that the problem? Other than the documents that we've been talking about. Okay, well, about 2019 agreement. I mean, I read the testimony that was offered up, and you've got witnesses on behalf of defendants that simply say, well, that's what the document says, but I'm not familiar with it. I don't see anybody who says that he or she has any familiarity with any such agreement. I don't see any acknowledgement by defendants that that, in fact, is an agreement that they entered into. So what is there? Well, like I said, Your Honor, it's certainly suspicious. Okay, then I'm going to ask you, why would your client have not made reference to a three-year agreement in the back and forth, including this April 2019 letter from Smokehouse that I've referred to? Why is there no reference to a three-year agreement if, in fact, there was a three-year agreement? Well, Your Honor, oftentimes the parties as opposed to the attorneys can be a little bit more informal. But I don't know, standing here. This April memorandum makes specific reference to purchase orders. It doesn't make reference. I mean, it gives purchase orders by number. It lists, what, like six different purchase orders by number. And the first signature here is Tim Brown, who's the one that says, I entered into a three-year agreement a couple years before, and he never says anything about a three-year agreement. Really? That's the reason my skepticism, and I'd love to be set straight, but so far. Well, I think perhaps evidence that the parties agreed to the terms of this 2017 agreement is the fact that they did, in fact, perform consistent with that. But we've already gone over that. After the 2015 agreement, they continued to sell for like a year before any other agreement was discussed. And the position of defendants is that they offered five months and wouldn't go higher than that, and they continued to sell. So that's the fact that they continued to sell doesn't tell me they must have had an agreement. Well, not just continued to sell, but sold specifically for the price terms that were contemplated under that 2017 agreement. I think the most notable is the 15-cent upcharge, which was for the washed salmon fillets. So it wasn't just that we've been focusing on the memorandum exception, but there are other facts, even though there may not be a specific reference other than the 2017 document to a three-year term. The parties were, in fact, performing as if that contract were in existence. And that includes, for example, the 15-cent upcharge for washed salmon. But they were performing in an ad hoc way, right? So you had an initial one-year supply agreement, and then it went into ad hoc ordering. You know, in order to qualify under the past performance exception, I think you have to show a lot more than just the fact that they continue to conduct business with one another and sell to each other. There's nothing that suggests to me that that was performance under a contract as opposed to just on an ad hoc basis. Well, one would expect if the performance was on an ad hoc basis for the pricing and terms to fluctuate. Here we're talking about minimum amounts of salmon at specific prices that were contemplated under that agreement that were indexed to a particular standard. And here, the 15-cent upcharge that was stated in the 2017 document remains static. The parties continue to adhere to that as contemplated under the 2017 agreement, as did the pricing. And in nearly all circumstances, the pricing was consistent, all but a few occasions in which Mr. Brown complained, and ultimately those issues were resolved. So we're not just talking about an errant reference, and the parties continue to do their own thing for two and a half years. We're talking about an instance where the 2017 agreement was adhered to during the course of dealings between these two parties. And when there was an allegation of breach, and we understand that appellees have asserted that the breach didn't relate to the 2017 agreement, but when there was an allegation of breach, we believe the facts show that that breach occurred in early 2019 and specifically related to the terms of the 2017 agreement. Well, you're over your time. Let me see if my colleagues have any other questions before we hear from opposing counsel. Thank you, Your Honor. Good morning, Your Honors. Michael Weiss, may it please the Court. On behalf of defendants, Judge Clifton, you are exactly correct. There are no other references in this record to a three-year supply agreement. The 2019 agreement that has a reference to this 2017 unsigned writing, it's not a deal, it does not ratify a deal, it is a statement at best to an unsigned document. That does not make a three-year deal. This three-year deal came out of the blue after a lawsuit was filed or with that lawsuit being filed and came from his home where never was this agreement out in the public. Publicly, he told potential purchasers that he had no long-term agreements with any of his suppliers. The supply arrangement here was a one-year term in 2015 to 2016. After that, it was invoice by invoice. Judge Sanchez, you are exactly correct. It was ad hoc, at will, invoice by invoice. They could not reach agreement on whether it was going to be five months or two years. Smokehouse proposed two years. My client said no, only five months. It dropped there. There was never any other than some request, but there was never a statement of a three-year. You are exactly correct, Judge Clifton. It is convenient that this is now a three-year. It comes after the supply discontinuance and just incorporates that so that he can have a lawsuit. The memorandum of exception, as the district court found, just does not apply here. Partial performance does not apply here. There is nothing that gets the plaintiffs around the statute of frauds. I think I've covered the statute of frauds. I don't want to beat it down. If you have any questions on any of it, I think you're exactly right as well on the representative. Judge Liu suggested with regard to that reference in the 2019 agreement to an agreement dated July 3, 2017, Judge Liu suggested that there might have been a purchase order or some other agreement that day. Do we know that? Is there anything in the record or otherwise that tells us that there was something else that might have been referred to by that pretty specific reference? There is nothing in the record that tells us that. What is in the record is my client, Vicente, my client's representative, Vicente de Cruz, saying there was no three-year agreement and all I ever offered was the five-month proposal. But to your question, no. But the standard is, to make the statute of fraud, that there needs to be some relationship, something more, essential terms in the 2019, a relationship unlike with the Albion case or the Surleys case where you had interest notes connected with, in the same envelope, a check, or you had an employment agreement that was unsigned and you had payroll records. Those are intimately related to each other such that there had to have been an agreement. The facts are completely opposite here. There was no such agreement, and I think the Court is exactly on that page with that. So we do have the 2019. As I understand it, the statute of frauds argument, and maybe the broader argument, at least the statute of frauds argument for plaintiff, hangs on this 2019 agreement, which is clearly and concededly signed by both parties. And that agreement does contain a specific line, delayed and on-ship containers, as referenced in the agreement dated July 3, 2017. So from the perspective of your client, what did that reference mean? So in the record, there was no three-year. All that happened was a proposal for a five-month. I can tell you there's some additional testimony that did not make the record, which I'm a little cautious to talk about, but where he says with clarity all he ever offered was a five-month. So I don't have a definitive answer for you in the record. Is there anything that speaks to the 2019 agreement and the understanding as to what that reference meant? Other than my client saying no three-year term, not specifically. And I would caution that there's a standard to get over, a threshold requirement from the California Supreme Court in Sterling v. Taylor that first needs to be met before we can ever get there. I would move on to a couple of the other causes of action, which I think do not raise a tribal issue. The fraud cause of action, the economic loss rule clearly applies. The reference to the Ratigan v. Uber case does not impact this case. That case, pending in front of the California Supreme Court, has to do with whether there's personal-type non-contractual damages. Like in Robinson Helicopter, they were exposed to – non-contractual damages, FAA sanctions, or a helicopter crashing and people being injured or killed. Same thing in Ratigan. Uber launched too quickly in Argentina, exposing the lawyer there to personal-type damages. None of that applies here. There are only two types of damages being claimed, both contractual, consequential from the alleged three. $67.5 million loss of business value and the $278,000 claim by DH Brands for lost license fees. Both of those types of damages. Sitting above all of these claims are – there is no satisfaction of the element of damages. I know the district court did not get there, but there is no recoverable damages here. $67.5, I covered that in my brief and in the summary judgment file, too speculative to be recoverable. And the $278,000, there's no standing or foundation that relates to Aqua Chili because there's no privity of contract. Covering the other causes of action, the district court got this exactly correct. The district court did a detailed analysis of each and every cause of action, had two opportunities, issued two very detailed orders, and I would submit that across the board the judgment should be affirmed. Unless the court has any further questions, I would sit down. One question on a different subject, which is that much of the record as it comes to us is sealed. And I was in private practice for 25 years. I had clients that wanted to have things sealed, too, and we would seal things by stipulation. But our court approaches that somewhat differently, and in particular for any disposition by this court, we have to be cognizant of what's really confidential and what's not. And I'm not sure looking at it at this point in time, there's very much that is confidential or eligible for sealing if we were to go through that exercise today. And I'll be fair and put this to both sides, but are there materials that you're aware of that have business confidentiality concerns attached to them today? In my opinion and my client's opinion, no. We don't have anything that we would request to be confidential. What happened here is the plaintiffs had asserted that a number of these, the business purchases and that information, their supply information, supplier information, that all that should remain confidential. To be honest, I didn't find the need to fight with them over it. And so we just went along with that. I'm not faulting anybody for this. We just have to deal with it at this point in time as we ultimately render our decision. I would pass the baton over to my colleague. And what he asserts, you know, I'm not going to oppose. Thank you. Thank you, Your Honor. Appreciate your time. Mr. Kinsey, I think you're over, but I'll give you a couple minutes to respond. Yes, thank you very much. First, tackling the last issue, most of the references in our briefing were actually the documents that the appellees had marked as confidential. And so we don't believe there's anything presented in the text of the briefs. We didn't file a motion, obviously, to maintain this proceeding as confidential. So we shouldn't feel inhibited in discussing anything because it's now all basically on the table. That's correct, Your Honor. Thank you. And one thing that I did want to just address briefly is the fraud argument. This really is an instance where it wasn't just, you know, telling somebody that they weren't going to renew. This is a circumstance where the Dela Cruz and others were telling Smokehouse that everything was good, that they were going to continue to be supplied, yet the rug was pulled out from underneath them, and it was absolutely concealed that there was a formal decision made that Smokehouse was going to be cut off. So we do believe that's actual fraud. We believe that when you start talking, there is a duty. And we also believe that, consistent with Hoang Phuong, the Sriracha case, that all of the factors existed, including this informal relationship that the court previously referred to between the parties, and in particular Mr. Dela Cruz and Mr. Brown, that would give rise to that duty. So even if the court finds that this agreement falls within the statute of frauds, we do believe that there is ample evidence to survive summary judgment on the issue of fraud. Thank you. Thank you, counsel. Thank you both for your helpful arguments. The matter will stand submitted, and court is adjourned. All rise. This court for this session stands adjourned.
judges: CLIFTON, SANCHEZ, Korman